# Kepler *versus* Davis.

1. A guardian had money of his ward ; he placed it in his wife's hands at the instance of his surety, to preserve it from his creditors and his own control ; she invested it in real estate, and by various transactions realized profit, with which she purchased property which was levied on under an execution for a debt of the husband. *Held*, that the money with its profits belonged to the ward and the accretions could not be seized as the husband's.

2. Trustees cannot derive advantage from the administration of the trust property.

3. Profit derived from land purchased by a trustee with trust money shall go for the benefit of the *cestui que trust.*

4. The ownership of a trust fund is unaffected by the change of the custodian, or where it is taken by a volunteer or one who has notice of the trust.

5. Other moneys came into the wife's hands from the minor sons of the husband, who had relinquished their earnings; the husband took no part in the transactions of the wife. *Held,* that the creditors of the husband could not be benefited by her profit from these moneys.

November — 1875.  Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Crawford county :* Of October and November Term 1875, No. 181.

This was a feigned issue in a sheriff's interpleader, framed December 9th 1874, in which Martha C. Kepler, claimant, was plaintiff and A. Stuart Davis was defendant.

To August Term 1858 a judgment had been recovered against Samuel W. Kepler, the husband of the plaintiff; on the 2d of August 1865 this judgment was assigned to A. Stuart Davis, the defendant; it was revived, and to November Term 1874 an execution was issued, under which hotel furniture and household goods were levied on by the sheriff as the property of S. W. Kepler; his wife claimed that the goods belonged to her; this issue was made to try the ownership.

The case was tried April 20th 1875, before Lowrie, P. J.

The plaintiff testified that her husband, as guardian of his minor children by a former marriage, had in his hands $300 belonging to the minors, which he paid over to the plaintiff; that Dr. Jennings had given her a horse for nursing a sick friend; that she sold the horse for $150; that in 1863 she bought real estate in Clapville for $1300, of which she paid $400 down, being the $300 guardian money and money given her by her step-son; in 1864 she sold this land for $5000; she bought other real estate for $1200, $225 of the purchase-money she got from her brother, E. C. Crouse; she sold it for $2300; she purchased the "Peiffer farm" for $4000, and in 1872 sold it for a house and lot in Meadville and $3500; with part of this she purchased the goods levied on; they were worth $2000 or $3000.  The Clapville property was conveyed to Mrs. Kepler by A. S. Davis, the defendant and execution creditor, by deed dated 17th of March 1863, and he took a bond and mortgage for the unpaid purchase-money.  Davis at that time and for some time previously, and up to 1869 or 1870, had been the attorney of S. W. Kepler, the husband, and knew at the time of the purchase of the several properties, and that the titles had been taken in the wife's name.

Peter Kepler, one of the sons, testified that in 1862 he was eighteen years old; his father had given him his time; he gave his mother his bounty money, and other money he had obtained in the army, amounting in all to $153; if he came back he was to have the money, if not she was to have it.

Pharos Kepler, another son, testified, that his father had given him his time by writing; he went into the army in 1863, being

[Kepler v. Davis.]

then a minor; at the time of his enlistment and at subsequent times he gave his mother money amounting in the whole to $631.

The plaintiffs then made the following offers of evidence:—

1. To prove by S. W. Kepler and other witnesses that the witness was guardian for his children, and had money of theirs in his hands, and that he, at the instance of his surety, gave the money, $300, to his wife, who invested it in the Clapville land, and this with the knowledge of the defendant.

2. To prove that the witness had, since 1863, bought and sold real estate, and has now property of his own and has kept his bank account separate from his wife's.

On objection by defendant, both offers were rejected and several bills of exception sealed.

The plaintiff having closed her case, the court directed a judgment of nonsuit to be entered and overruled a motion to take it off.

The plaintiff took a writ of error. She assigned for error:—

1, 2. The rejection of her offers of evidence.

3, 4. Directing the nonsuit and refusing to take it off.

*C. R. Marsh* and *D. T. McKay*, for plaintiff in error.

*J. W. Smith* and *W. R. Bole*, for defendant in error.—Having no separate estate Mrs. Kepler could acquire during coverture no property by her earnings; they belonged to her husband, and if she purchased with borrowed money or on credit, the property belonged to the husband: Bucher *v.* Ream, 18 P. F. Smith 421; Curry *v.* Bott, 3 Id. 400; Baringer *v.* Stiver, 13 Wright 129; Robinson *v.* Wallace, 3 Id. 129; Raybold *v.* Raybold, 8 Harris 308.

Mr. Justice WOODWARD delivered the opinion of the court, January 6th 1876.

The property in controversy here is part of the profits derived by the plaintiff in various transactions in which lands were purchased and sold by her between the years 1861 and 1872. The fund by which she was enabled to commence these transactions is stated in the bill of exceptions to have been made up of $300 received from her husband, Samuel W. Kepler, who held it as guardian for his children by a former wife; of $150 received from her son during the years 1862 and 1863; of $225 given her by her brother; and of $85 given her by her son; which two last amounts were paid on account of the purchase-money for two lots in Titusville, bought, as shown by the deed produced on the trial, on the 13th of January 1864. By the evidence contained in the defendant's paper-book, the money traced into the plaintiff's hands, in addition to the $300 she held as guardian, and transferred to her, consisted of $150 she had realized by the sale of a horse given her

[Kepler *v.* Davis.]

by Dr. Jennings; of $225 given her by her brother, Captain Crouse; of $153 received at different times from Peter Kepler; and $631 given and sent her by Pharos Kepler.   These sums amounted to $1159, and including the $300, to $1459.   The money thus obtained appears to have been invested with remarkable sagacity and success.   In 1872, a property known as the "Peiffer farm," was sold by the plaintiff for $3500, and a house and lot in Meadville. The furniture, which is the subject of this controversy, and which is worth from $2000 to $3000, was purchased with part of the proceeds of this sale.

Upon these facts, the defendant, holding a judgment obtained against Samuel W. Kepler, in 1858, has levied on the furniture in the possession of the defendant, and claims in this issue the right to press his execution on the ground that the entire accumulations which she has made are the property of her husband.   In support of this claim, a multitude of recognised authorities are cited, and a series of established principles are invoked.   No question is made as to the validity and binding force of the rules relied on in the argument, that in the case of a purchase after marriage by a wife the burden is upon her to prove distinctly that the purchase-money was paid with funds which were not furnished by her husband; that, in the absence of such proof, the presumption is violent that he furnished the means of payment; that when she has no separate estate, she can acquire no property with her earnings during coverture; and that her earnings are her husband's, and if she purchased with borrowed money or on credit, the property belongs to him.   The just and salutary provisions of the Act of 3d of April 1872, which now secure the separate earnings of a married woman to her separate use, do not reach this case, for they were made prospective only in their operation.   So that, harsh and oppressive as the working of accepted legal rules might in this instance appear to be, the simple inquiry is whether the facts which affect these parties demand their application.

There can be no pretence that any portion of the moneys in question was received by the plaintiff from her husband, apart from the trust fund of $300, which he passed to her.   If the evidence be resorted to in order to prove that Peter Kepler, who gave her $153, and Pharos Kepler, who gave her $631, were minor sons of Samuel W. Kepler, a resort to that evidence proves that all his claim for their earnings and upon their time had been relinquished.   And on what principle can the accretion of the estate, in which these moneys were invested, be held to enure to the profit of her husband?   Nothing in the record shows on his part either act or participation, or even counsel or advice.   It would be a novel rule that would give to a husband's creditors, whether he be worthy or worthless, the benefit of a wife's judicious management of her separate estate.   Before the Act of 1872, her earn-

[Kepler v. Davis.]

ings were at their mercy, but the law has never held as embraced in such earnings, the results of the exercise of the qualities of energy, prudence, sagacity and foresight.

So far as the defendant's claim is founded on the transfer of the $300 in Samuel W. Kepler's hands, as guardian, it is subject to a class of principles widely different from those invoked in the argument. While the money was physically in his possession, it never belonged to Kepler at all. Retained in his hands, unmixed with his private means, his creditors could not have reached it. But passed over to his wife, the theory is, that it became his property in her possession. Why, it is the very basis of the plaintiff's case, that the transfer was made at the instance of his surety, in order to protect the fund as well from the grasp of his creditors as from his own control. Proof of this was offered in the testimony which the court improvidently rejected. In his hands the money was the property of his wards. It would be a burlesque of law, if the transfer to his wife should be held to extinguish their ownership, and transmute his bare legal title into a beneficial ownership, which a sharp creditor at his pleasure could absorb. The law works no such absurd wrong. The fund in the plaintiff's hands belonged to the minors still. And the profits that have been realized by its use are theirs. It is a general rule established to keep trustees in the line of their duty, that they should not derive the least advantage from the administration of the property committed to their charge : Lewin on Trusts 288. If trust money be laid out by a trustee in buying and selling land, and a profit be made, that shall go, not to the trustee who has so applied the money, but to the cestui que trust, whose money has been so applied : Id. 289, citing Fosbrooke v. Balgny, 1 Mylne & Keene 226. So, an attorney, guardian, or other person invested with a fiduciary character, must account for all profits to the client, or infant, or other party whose means have been employed. Per Lord Brougham, in Docker v. Somes, 2 Myl. & K. 665. That the same rules prevail in Pennsylvania is proved by a whole current of decisions, of which Hall's Appeal, 4 Wright 409 ; Robb's Appeal, 5 Id. 45 ; Eshelman v. Lewis, 13 Id. 410 ; and Campbell v. McLain, 1 P. F. Smith 200, are only illustrations. Authority is scarcely needed for the proposition that the ownership of this fund by the wards remained unaffected by the change of its custodian. It is text law that a trust already in existence, and annexed to the present subject-matter, is created de novo as against a person who takes as a volunteer, or with notice, by a title derivative from the original trustee : Lewin on Trusts 205. No question of deception by the plaintiff, or of fraud upon the defendant, arises here. No clandestine action is alleged, and no step was taken in a surreptitious way. The defendant had full notice. He had been the attorney of Kepler, as the latter testified, from 1860 to 1869 or 1870, and the judgment he has

[Kepler *v.* Davis.]

bought, and is pressing, was obtained, as has been stated, in 1858. The wards to whom this sum of $300 and its accretions belong, are not parties to this litigation. The question as to the extent of their rights may well stand over. If the facts which the plaintiff alleged are established by a verdict, it is only necessary now to say, that in the adjustment of that question, neither the defendant, nor any other creditor of Kepler, can have any concern. Kepler bought and sold land in these years, had property when the levy was made, and kept a separate bank account from his wife's.

In the stage the cause had reached, when the evidence specified in the second assignment of error was offered, it was properly rejected · as irrelevant. If the trial had gone on, the propriety of admitting it as rebutting testimony would have depended on the character of the defendant's evidence. But the offer to prove the facts connected with the transfer of the $300 to the plaintiff, at the request of the surety for the guardian, and with the knowledge of the defendant, should have been received. And the plaintiff had the right to require the submission to the jury of the evidence she had produced. The first and third assignments of error are sustained.

Judgment reversed and *procedendo* awarded.